FILED
DIST COURT
MIDDLE DIST. OF LA

2004 OCT 28  P 4: 48

SIGN
BY DEPUTY CLERK

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **RENE LEMAIRE** | **CIVIL ACTION** |
| **VERSUS** | **NO. 03-775-C-M3** |
| | **JUDGE: RALPH TYSON** |
| **STATE OF LOUISIANA, THROUGH** | **MAGISTRATE-JUDGE: DALBY** |
| **THE LOUISIANA DEPARTMENT OF** | |
| **TRANSPORTATION AND DEVELOPMENT** | |

**************************************************************************

### OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

NOW INTO COURT, through undersigned counsel, comes and appears Rene LeMaire,

Plaintiff herein, who, reserving all other rights that he may have in the premise, opposes the *Motion*

*for Summary Judgment*, filed on behalf of Defendant, State of Louisiana, through the Department

of Transportation and Development, hereafter referred to as LA D.O.T.D., as follows:

1.

Rene LeMaire, Plaintiff herein, opposes the Defendant's assertion that the Plaintiff alleges

that he was the subject of discrimination and harassment due to his race. At no time has the Plaintiff

alleged racial discrimination, or that he was subjected to any form of discriminatory behavior

because of his race. A cursory examination of the Plaintiff's Petition for damages will find that the

Plaintiff alleged that the Defendant failed to enforce and effect an effective policy regarding sexual

harassment, discrimination, and retaliation, failed to adequately train its employees regarding sexual

harassment, discrimination, and retaliation, failed to adequately supervise its employees, failed to

take adequate steps to insure Plaintiff's work environment would not be hostile and/or would be less

hostile, failed to take reasonable steps to prevent the harassment from occurring in the first place,

failed to investigate Plaintiff's complaints, and failed to take any action to address Plaintiff's

RET

| INITIALS | DOCKET# |
|---|---|
| | |

complaints. Furthermore, the factual description of the circumstance of the Defendant's violation is devoid of any reference to racial discrimination.

2.

Plaintiff further opposes and denies the Defendant's assertion that the Plaintiff is obligated to provide evidence, which if accepted as true, is sufficient and as a matter of law, to meet dual burden of proof of proving that LA D.O.T.D.'s explanation for why the plaintiff was terminated is false and that there were racially discriminatory reasons that he was dismissed, as required by *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed 407 (1993); *E.E.O.C. v. Texas Instruments, Inc.*, 100 F.3d 1173 (5th Cir. 1996) and *E.E.O.C. vs. La Office of Community Service*, 47 F.3d 1438 (5th Cir. 1995). The Plaintiff has not alleged harassment or other discriminatory conduct by the defendant based on or due to race, therefore, the Plaintiff has no duty or burden to prove the essential elements required for a successful racial discrimination civil action.

3.

Plaintiff further opposes the Defendant's request to dismiss the Plaintiff's claims that the Defendant failed to have in full force and effect, or failed to enforce, an effective policy regarding sexual harassment, discrimination, and retaliation; that the Defendant failed to adequately train its employees regarding sexual harassment, discrimination, and retaliation; that the Defendant failed to adequately supervise its employees; that the Defendant failed to take adequate steps to insure Plaintiff's work environment would not be hostile and/or would be less hostile; that the Defendant failed to take reasonable steps to prevent the harassment from occurring in the first place; and that the Defendant failed to investigate Plaintiff's complaints or to take adequate actions to address Plaintiff's complaints. This Honorable Court will find attached Affidavits, based on personal knowledge and admissible in evidence and other evidence showing that there is a genuine dispute

as to material fact and issues.

4.

Plaintiff further opposes the Defendant's assertion that any and all claims made by the Plaintiff under Louisiana State law are barred by the 11th Amendment of the United States Constitution.

WHEREFORE PLAINTIFF PRAYS that the Motion for Summary Judgment, filed herein on behalf of State of Louisiana, through the Department of Transportation and Development, be denied at its costs.

PLAINTIFF FURTHER PRAYS for all other orders and decrees necessary or proper in the premise which law, equity or the nature of the case may permit.

SUBMITTED:

BARNES AND GREENFIELD
AN ASSOCIATION OF
PROFESSIONAL LAW CORPORATIONS
351 ST. FERDINAND STREET
BATON ROUGE, LOUISIANA  70802
TELEPHONE (225) 343-9583
FACSIMILE  (225)336-9880

BY:  _____
      JOE F. STEVENSON
      BAR ROLL NO. 27,299

CERTIFICATE

I hereby certify that a copy of the above and foregoing *Opposition to Motion for Summary Judgment* been served upon the Defendants, through their attorney of record, Wendell C. Wood, Assistant Attorney General, P.O. Box 94005, Baton Rouge, Louisiana 70804-9005, by United States Mail, postage prepaid and properly addressed, this _28_ day of _October_, 2004.

<br/>

_Joe F. St_____

**JOE F. STEVENSON**

# EXHIBIT ONE

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

RENE LEMAIRE                                                        CIVIL ACTION

VERSUS

THE LOUISIANA DEPARTMENT                              NO. 03-775-C-M3
OF TRANSPORTATION AND
DEVELOPMENT
*****************************************************************************

## AFFIDAVIT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

       **BEFORE ME**, the undersigned authority, duly commissioned and qualified in and for the

Parish and State aforesaid, personally came and appeared:

### RENE LEMAIRE

who, after by me being first duly sworn, did depose and state the following:

1.      I am not alleging that I was terminated or discriminated against because of race.

2.      All allegations contained in my complaint are due to offensive and sexually-oriented language, sexual innuendo and sexual behavior of my direct Supervisor, Milton Endres. These acts include detailed accounts of Mr. Endres' sexual encounters and accounts of child molestation, as well as other acts of sexual harassment.

3.      When I objected to Milton Endres' sexual comments and behavior, he retaliated by assigning me to numerous unpleasant duties outside of my job description and required to work multiple shifts at different bridge locations throughout the parish.

4.      Milton Endres, falsely accused me of stealing toilet paper from parish facilities and sleeping while on duty. These false accusations ultimately were used as a pretext for my termination from the Louisiana Department of Transportation and Development (DOTD).

5.      After objecting to Mr. Endres' sexual harassment, I was constantly subjected to derogatory comments and remarks by Mr. Endres.

6.      On or around June 15, 2002, Milton Endres, subjected me to derogatory comments, told me "I made his life miserable" and said that if I ever tried to get a transfer he would make it impossible. He told me that I was stuck on the bridges and the only way I could get away from the bridges was by quitting my job. Mr. Endres then instructed me to spray herbicide on a large lawn area surrounding a swing bridge, as well as other jobs not required in my job description (Bridge Operator 2). It was obvious to me that this was retaliation for rejecting Mr. Endres' sexual advances and objecting to his explicit sexual stories. I argued with Mr. Endres and left the job site to complain of Mr. Endres behavior to Mr. Rodney Jones, Mr. Endres' direct supervisor and possibly to resign from my position.

7.      I went to Mr. Rodney Jones, Mr. Endres' direct supervisor, with the intent to resign from my position and to file a complaint about the offensive sexual harassment.

8.      Mr. Jones persuaded me not to resign from my job and informed me that it was not in my best interest to file a sexual harassment complaint in this matter, and was persuaded to file a grievance, complaining of unfair/unjust treatment by my supervisor, rather than a sexual harassment complaint. Furthermore, Mr. Jones assured me that he would speak to Mr. Endres and put a stop to the inappropriate behavior.

9.      I was later informed that an investigation of my grievance found no "conclusive evidence" of misconduct by Mr. Endres. The letter also stated that Mr. Endres was instructed to act in a professional and courteous manner.

10.      Soon after the meeting with Mr. Jones, I was disciplined for leaving the job site and refusing to spray herbicide on the lawn. I received a two-day suspension, without pay.

11.      Immediately upon returning to work, I was again subjected to sexual and verbal harassment and retaliation by Milton Endres.

12.      I deny the allegation that Milton Endres found me asleep while on duty as Bridge Operator at the Bayou Pigeon Bridge, on Friday, July 19, 2002.

13.      On the day Mr. Endres accuses me of sleeping on the job, I did not have the door locked. However, it is not uncommon for me and other Bridge Operators to lock the door, since it is department policy to keep the door locked. This policy is stated in a sign contained in several swing bridges, advising employees to keep the door locked at all times.

14.      On the day Mr. Endres accuses me of sleeping on the job, I did not have all of the blinds lowered or closed. I did have the blinds near the desk lowered and closed, so that the morning sun would not shine into the Bridge House. The other blinds were open.

15.      When Mr. Endres entered the building, I was not asleep on the floor, nor did Mr. Endres need to use his key to get in, because the door was unlocked. Furthermore, I did not see Mr. Endres' attempt to telephone Mr. Jones to report the incident.

16. To the best of my recollection, Mr. Endres came by the Bayou Pigeon Bridge, while I was on duty, between 9:00 a.m. and 9:30 a.m. When he entered the Bridge House I was sitting at the desk. Mr. Endres began yelling that he caught me sleeping on the job. I told him that I was not asleep and was sitting down at the desk. However, he continued to yell at me until he dropped the lawn mower tire off and left.

17. I did not speak openly to Ms. Louanna LeBlanc, Mr. Terry Davis or Huey Gros, that "I was in trouble because Mr. Endres caught me sleeping on the duty." However, I do remember telling Huey Gros that Mr. Endres had accused me of sleeping on the job and that I was worried that he was going to get me fired.

   I did complain to Terry Davis, who relieved me at the end of my shift, that Mr. Endres had come by the bridge, had begun yelling at me, and had accused me of sleeping on the job. It is my understanding that Terry Davis supplied Mr. Jones with a written statement to this effect.

   Huey Gros asked me about the incident and I told him that Mr. Endres had yelled at me and had accused me of sleeping on the job.

18. I admit that I was late to work on July 25, 2002. The alarm clock did not go off on time and I did not wake up until 8:45 a.m. When I realized that I had overslept, I called the Bridge House, but the phone was busy. I immediately got dressed and rushed to the Bayou Pigeon Bridge, arriving at the bridge at about 9:30 to 9:45 a.m. While on my way to the bridge, I used my cell phone to make several calls to the Bridge House, to tell them that I was on my way, but the telephone was busy every time I called.

   When I got to the bridge, I found that Ms. LeBlanc had arrived at the bridge and had been manning it in my absence. She asked me what had happened, I told her that the alarm clock did not go off and that I had overslept. I then called Mr. Endres to tell him that I was at the bridge and to tell him why I was late. He cut me off while I was telling him what had happened, told me to cut the grass and demanded to talk to Ms. LeBlanc.

19. I also admit that I did not mow the grass at the Bayou Pigeon Bridge. However, the reason I did not mow the grass is because a heavy rain began to fall at about 11:45 a.m. and made mowing the grass impossible. The downpour was so heavy that it caused the power to go out and back-up generator to cut on. This can be verified by the log kept at the Bayou Pigeon Bridge House.

   A review of the job description of a Bridge Operator I and Bridge Operator II, indicates that a Bridge Operator's duty is "to operate a power driven drawbridge and to perform or oversee the preventive maintenance on the bridge," such as:

   A. Conduct visual inspection of the bridge;

   B. Train lower level operators in the operation of the bridge;

C.   Prepare bridge logs, documenting bridge opening and closings in response to marine vessel signals;

D.   Use the marine radio to communicate with vessel pilots;

E.   Report mechanical or electrical problems to appropriate personnel and/or take necessary corrective action.

F.   Lubricate operating machinery, check fluids and change oil in emergency generators;

Mowing grass and other ground keeping work does not seem to be part of the job description of a Bridge Operator. Furthermore, several of the Bridge Operators, including Ms. LeBlanc and Ms. Boudreaux, seldom, if ever, mow the grass at their assigned bridges, which further indicates that grounds keeping duty is not a standard part of a Bridge Operator.

_____

**RENE LEMAIRE**

SWORN TO AND SUBSCRIBED before me, Notary Public, on this _____ day o f

October, 2004, in my office in Baton Rouge, Louisiana after due reading of the whole.

_____
JOE F. STEVENSON
BAR NO. 27,299
NOTARY PUBLIC

# EXHIBIT TWO

**MIDDLE DISTRICT OF LOUISIANA**

**RENE LEMAIRE**                                    **CIVIL ACTION**

**VERSUS**

**THE LOUISIANA DEPARTMENT**                    **NO. 03-775-C-M3**
**OF TRANSPORTATION AND**
**DEVELOPMENT**
*************************************************************************

<u>**AFFIDAVIT**</u>

**PARISH OF EAST BATON ROUGE**

**STATE OF LOUISIANA**

     **BEFORE ME**, the undersigned authority, duly commissioned and qualified in and for

the Parish and State aforesaid, personally came and appeared:

**MITZI DOIRON**

who, after by me being first duly sworn, did depose and state the following:

     I Have known Milton Enders for approximately 20 years. For many years I and Mr.

Enders lived in the same community, Bayou Pidgen and attended the same church. Prior to the

incidences described below, I had no knowledge of Mr. Enders' sexual preference and had

assumed, because of his long marriage, that Mr. Endres was heterosexual.

     In November 2001, I witnessed the first incident of sexual harassment of my fiancé, Rene

Lemaire by Milton Endres. The incident took place at the Grosse Tete Bridge house, located in

Grosse Tete, LA. Rene and I were sharing one car at this time and I needed the car that evening,

so I brought him to work.

     As we entered the bridge house, I saw Milton Endres, Rene's supervisor, at the control

panel operating the bridge for marine traffic. Rene and I both said hello and Milton replied hello.

I asked Milton how he had been doing, because it was common knowledge that he and his wife were separated and going through a divorce. Milton then replied, "Alright, well, I'm making it." As a friendly gesture I told Milton that if he were ever passing through Bayou Pigeon, Louisiana, where I lived at the time, he could stop by.

Milton thanked me for offering, but state that he wasn't allowed to fraternize with his employees. He giggled.

He then proceeded to say to us that he had been hanging out in New Orleans on the weekends, with some guys he met in Baton Rouge. He also stated that they all had a lot in common, because they were molested too.

I had not said anything about anyone being molested and Mr. Endres' statement was so unexpected and his body language so odd, that both Rene and I were stunned. In an effort to change the topic of conversation, Rene, interrupted and asked, how is Hannah, Milton's daughter taking the divorce, Milton replied she is doing okay, Milton stated to us that he and his estranged wife were staying friends for their daughter and that he had every intention of making sure she (his daughter) was taken care of financially. I then said to Milton that I really respected that he was going to provide for his daughter and take care of her.

Milton then became teary eyed and told Rene and I that, he even though he molested my ex-husband, Kevin, he felt no responsibility for Kevin not supporting our kids. At this point, Milton looked directly at Rene, smiled and said "I did not always push it on him, Kevin, sometimes he came to me for it."

Mr. Endres' statement left me speechless. I was aware that my ex-husband, had been

molested throughout his childhood, but, prior to my conversation with Mr. Endres on that day, I had been unaware he and my ex-husband had a sexual relationship. Needless to say, I found this this both shocking and disturbing.

At this point it was obvious that Rene was disturbed and uncomfortable with Mr. Endres' statements. Rene turned away and stepped outside of the Grosse Tete Bridge house to smoke a cigarette. When Rene walked back inside, he told Milton that this conversation made him uncomfortable and that he did not want to talk about it. However, Mr. Endres went on to explain to Rene and me that it was not the sex he enjoyed so much, because he had better sex with his wife, but it is the feeling of being close to another man that he enjoys. Mr. Endres went on to talk about his father committing suicide when he was young and how he was molested. He said that he was confused, because even thought he was molested, there were times he returned to his molester for the male attention.

The only way I can describe Mr. Endres' body language during the conversation is creepy. I was very uncomfortable with the way Milton was acting and could see that Rene was also very disturbed by his conduct.

Rene told Mr. Endres that his dad died when he was 10 years old, but that he had never wanted to be close to a man. Then Rene told Mr. Endres that "I don't want to hear anymore about it." Rene also clearly told Mr. Endres that the conversation made him feel uncomfortable and stepped outside.

At this point I was very upset and wanted to leave. I was putting my purse on my shoulder when Rene stepped back inside. He could see I was about to leave, he looked at me and

shook his head no, as if to say don't go yet. So I stayed realizing, Rene did not want to be alone with Milton.

Milton continued to talk about his new friends in Baton Rouge and their common bond of being gay and all having been molested. He said they go to gay bars on the weekends. Mr. Endres said that he doesn't drink and one of his friends told him, "if you never drink, how are we going to take advantage of you." He giggled and looked at Rene again, and said, he told them that "he doesn't have to drink to be taken advantage of." After this statement he gathered his things, said he was meeting someone and he had to go. I waited with Rene until, Milton was completely gone.

We were both in shock and wondered what was going on? We wondered why Milton continue to talk about these things even though Rene had told him that he did not want to hear about it. We both agreed that Rene was being put in an awkward position, because Milton is his boss. Rene said to me, "I don't even want to think about it anymore." Rene also said that he "wanted to block it out of his memory, so that he could deal with his job."

During the first half of February 2002, Rene phoned me from the Bayou Pigeon Bridge House. He was very upset and could hardly get the words out to tell me what was wrong. He said "Mitzi, I'm telling you if Freddie (Mr. Endres) does not stop talking to me about all of this stupid shit? I'm going to quit."

I told him to calm down and tell me what happened. He said "Milton was talking to him about men having sex in the street at a gay Mardi Gras and that someone asked Milton if he wanted to go next. Mr. Endres then grinned and told Rene he told the guy that "he can't do

something like that, because he has to know the person a while first."

I said, "Oh my God, Rene, what is Milton trying to do?"

Rene said that "he told Milton again, he did not want to hear this stuff," but Mr. Endres continued with his description of gay sex acts.

Rene's voice made it clear that he was very upset. He said "I don't know what to do, I don't believe this is happening, all I want is to do my job and go home."

We talked a little while longer and Rene thanked me for calming him down. He said that "he couldn't wait to get back home."

On the day after the February incident, Rene phoned me and said that Milton had come to the Bayou Pigeon bridge house and accused Rene of stealing toilet paper from the bridge house.

Rene and I both noticed that Milton began to treat him different. Milton began giving Rene all of the hard and dirty jobs to do, even when there were other employees who could do it. It was obvious that Milton was trying to cause Rene trouble, because Rene did not want to share in his type of conversation and because Rene made it clear that he was not interested in gay sex.

During this time Rene became withdrawn and showed little interest in things he would normally. Rene said that he was worried that Milton was hitting on him and that he worried that Milton would accuse him of doing something wrong to get him fired. I told Rene to put his mind into keeping his job and to avoided Milton whenever possible.

On day when I was at home, Rene came in to change his clothes and told me, that Milton phoned the Bayou Sorrel Bridge house and told Rene to meet him at the Indian Village Bridge near Grosse Tete, to cut the yard there. Rene informed me that if Milton said or did anything out

of the ordinary to him, he was going to quit.

Later that day, Rene returned home in a fury. He said that Milton Endres did not have a lawn mower for him to cut the grass and had told him that he wanted Rene to spray the entire yard down with herbicide.

Rene told me that he asked Milton, why he was required to maintain several yards and cover shifts on three different bridges and if he could get a raise?

To this Milton replied, that "Rene wasn't worth the pay he already received" and told Rene that "he (Rene) made his life miserable" and that if he ever tried to get a transfer, Milton would make it impossible. He told Rene that he was stuck on the bridges.

Rene was so upset that left the bridge and came home. The next day, Rene went to District 61 Headquarters to meet with Mr. Rodney Jones. At this meeting Rene planned to resign.

When Rene returned home after the meeting, he told me about the meeting. Rene said that Mr. Jones encouraged Rene to stay due to a shortage of swing persons and because Rene was needed to cover shifts at three different bridges.

Rene told Mr. Jones about the previous incidents with Milton and told Mr. Jones that he was uncomfortable about his situation. Rene also told Mr. Jones that he felt that he was being mistreated by Milton.

Mr. Jones, took Rene's statement and told him that he would meet with Milton and put a stop to the situation. Mr. Jones also told Rene that it was not in Rene's best interest to file a sexual harassment complaint, but to handle the situation within the office. Mr. Jones assured

Rene, that he, Mr. Jones, would take care of this problem.

On the day after Mr. Jones spoke to Mr. Endres about the harassment, Rene called me and told me that Mr. Endres came to the Bayou Sorrel Bridge, where Rene and a co-worker were on duty. Milton asked the co-worker to step outside, so that he could speak with Rene.

According to Rene, Milton began to cry and told Rene, that he thought he and Rene were friends and had an understanding. He accused Rene of forcing him (Milton Endres) to tell his supervisor, Mr. Jones, that he was gay and had molested his cousin.

Rene told Milton, that he (Milton Endres) was his boss and that Rene did not want to discuss these things with him. Rene then told him that, "If you did not have a problem discussing it with me, then you should not have a problem discussing it with your supervisor."

Rene told him that Mr. Jones told Rene he was not to discuss this with anyone, not even Milton. Milton, then said, he had to go.

A short time after this conversation Rene had surgery and took medical leave from work for about 3 weeks to recover. Soon after returning to work he received a letter from District 61, that he was going to be disciplined for walking off the job site. The letter also concerned his grievance and a statement that there is no evidence to substantiate his claim of mistreatment. Rene went to the disciplinary meeting, where he received two days leave without pay.

Rene continued to talk about the harassment he received from Milton Endres at the job. Rene became very depressed and we began talking about him quitting his job. Rene decided to try to transfer from his job at the swing bridges to another state job. He said that he wanted to continue to work for the state, but that the stress caused by Mr. Endres being his supervisor was

too much for him to handle. When Rene advised Milton he needed an application for civil service test and transfer, Milton told him he would bring it to the bridge. However, when Mr. Endres arrived at the bridge he accused Rene of sleeping on the job. Soon after Mr. Endres accused Rene of sleeping on the job Rene received termination notice papers and was fired from his job.

_____
MITZI DOIRON

SWORN TO AND SUBSCRIBED before me, Notary Public, on this _27_ day of October, 2004, in my office in Baton Rouge, Louisiana after due reading of the whole.

_____
**JOE F. STEVENSON**
**BAR NO. 27, 299**
**NOTARY PUBLIC**

# EXHIBIT THREE

☐ UNION MEMBER   ☐ NON-UNION MEMBER

## STATE OF LOUISIANA
### DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT
### GRIEVANCE FORM

| EMPLOYEE SECTION (check appropriate box) | HUMAN RESOURCES SECTION |
|---|---|
| ☑ STEP 1 - Date Submitted _____<br>(Must be filed with immediate supervisor within 7 working days.) | ☐ STEP 1 - Response Date _June 18, 2002_ |
| ☐ STEP 2 - Date Submitted _____<br>(Must be filed with Section Head/District Administrator within 5 working days after receipt of Step 1 answer.) | ☐ STEP 2 - Response Date _____ |
| ☐ STEP 3 - Date Submitted _____<br>(Must be filed with DOTD Secretary within 5 working days after receipt of Step 2 answer.) | ☐ STEP 3 - Response Date _____ |

EMPLOYEE NAME: _Rene LeMaire_     SS#: _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_

SECTION/DISTRICT: _61_  GANG: ____  WORK LOCATION: _Bayou Sorrel Bridge_

PRESENT CIVIL SERVICE JOB TITLE: _Bridge Operator_

NAME/TITLE OF IMMEDIATE SUPERVISOR: _Milton Endres_

### STATEMENT OF GRIEVANCE

_My grievance is of "unfair/unjust treatment." In certain situations that transpired on the job, I feel I was treated unjustly. I was spoken to in an unprofessional manner, and Improper subjects were brought up in conversations by my Supervisor._

### REMEDY REQUESTED

_To be treated fairly. To be treated with the same respect as far as speaking as he expects._

_[signature]_
### SIGNATURE

COPIES TO:
  UNION REPRESENTATIVE (IF APPLICABLE)
  SECTION HEAD OR DISTRICT ADMINISTRATOR
  HUMAN RESOURCES SECTION (HEADQUARTERS, ROOM 206)
  COMPLIANCE PROGRAMS SECTION (HEADQUARTERS, ROOM 241)




**STATE OF LOUISIANA**
**DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT**

P.O. Box 831
Baton Rouge, La. 70821
(225) 231-4126

M.J."MIKE" FOSTER, JR.
GOVERNOR

KAM MOVASSAGHI,
SECRETARY

JUNE 18,2002

Mr. Rene LeMaire
39125 Hwy 75
Plaquemine, Louisiana 70764-7732

Dear Mr. LeMaire:

I have investigated your complaint and can find no conclusive evidence to back up the statements made.

Although during a meeting with Mr. Milton Endres about this problem, I advised him that all contact with you be done in a professional and courteous manner and that only matters of work on hand be discussed.

If you are not satisfied with this rendering, you may file Step 2 Grievance with the Section Head/District Maintenance Engineer within (5) working days after receipt of this letter.

Very truly yours,

*Rodney B. Jones*

RODNEY B. JONES
ENGINEERING TECH. 5

AN EQUAL OPPORTUNITY EMPLOYER

# EXHIBIT FOUR

State of Louisiana

Department of Civil Service

H3 SM

10/23/00

128760

Last Effective Date 02/06/98


BRIDGE OPERATOR 1


FUNCTION OF WORK:

To operate a power driven drawbridge and to perform preventive
maintenance on the bridge.

LEVEL OF WORK:

Entry/Trainee.

SUPERVISION RECEIVED:

Direct Supervision from a Bridge Operator Foreman, Parish Highway
Maintenance Superintendent, or other equivalent level supervisor; may
receive lead worker direction from a Bridge Operator 2.

SUPERVISION EXERCISED:

None.

LOCATION OF WORK:

Department of Transportation and Development.

JOB DISTINCTIONS:

Differs from the Bridge Operator 2 by the lack of extensive on-the-
job training and advanced expertise. The Bridge Operator 1 serves in
a trainee capacity, to become proficient in the operation and
preventative maintenance functions of the assigned bridge(s).

EXAMPLES OF WORK:

Receives on-the-job training in the operation of power driven drawbridges.

Becomes familiar with Coast Guard regulations and DOTD policies on bridge operations.

Conducts visual inspection of bridge to ensure safe operation.

Prepares bridge logs, documenting bridge openings and closings in response to marine vessel signals.

Uses the marine radio to communicate with vessel pilots.

Reports mechanical or electrical problems to bridge leadworker or other appropriate personnel so that corrective action can be taken.

Lubricates operating machinery.

Checks fluid levels and changes oil in emergency generators.

Assists in the collection of information to report marine and vehicular collisions and damages.

MINIMUM QUALIFICATIONS:

No experience or training is required.

State of Louisiana

Department of Civil Service

H3 SM

10/23/00

128680

Last Effective Date 02/06/98


BRIDGE OPERATOR 2


FUNCTION OF WORK:

To operate a power driven drawbridge and to perform or oversee the
preventive maintenance on the bridge.

LEVEL OF WORK:

Journeyman.

SUPERVISION RECEIVED:

Broad review from a Bridge Operator Foreman, Parish Highway
Maintenance Superintendent, or other equivalent level supervisor.

SUPERVISION EXERCISED:

Trains lower level bridge operators; may serve as leadworker over one
or more lower level Bridge Operators.

LOCATION OF WORK:

Department of Transportation and Development.

JOB DISTINCTIONS:

Differs from the Bridge Operator 1 by the presence of advanced
expertise in the performance of duties and the responsibility to
train lower level operators.

EXAMPLES OF WORK:

Case 3:03-cv-00775-RET-DLD   Document 20   10/28/04   Page 25 of 46

Conducts visual inspection of bridge to insure safe operation.

Operates power driven drawbridge(s), insuring safe operation consistent with applicable Coast Guard regulations and DOTD policies.

Trains lower level bridge operators in the operation of the bridge and in all other related duties.

Prepares bridge logs, documenting bridge openings and closings in response to marine vessel signals.

Uses the marine radio to communicate with vessel pilots.

Reports mechanical or electrical problems to appropriate personnel and/or takes necessary corrective action.

Lubricates operating machinery. Checks fluids and changes oil in emergency generators.

Collects information and prepares report to document marine and vehicular collisions and damages.

MINIMUM QUALIFICATIONS:

One year of experience in the operation of power driven drawbridges.

# EXHIBIT FIVE




**STATE OF LOUISIANA**
**DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT**

P.O. Box 831
Baton Rouge, Louisiana 70821-0831
(225) 231-4102, Fax (225) 231-4108

M. J. "MIKE" FOSTER, JR.
GOVERNOR

KAM MOVASSAGHI, PH.D
SECRETARY

June 20, 2002

<u>CERTIFIED MAIL NO. 7000 1670 0012 5264 6632</u>
<u>RETURN RECEIPT REQUESTED</u>

Mr. Rene LeMaire
39125 Hwy. 75
Plaquemine, Louisiana 70764

Dear Mr. LeMaire:

You have been employed by the Department of Transportation and Development since March 19, 2001, and currently serve with permanent status as a Bridge Operator 2. In accordance with Civil Service Rule 12.8 and Secretary's Policy and Procedure Memorandum No. 26, this is to provide you with advance notice that you will receive a reduction in pay equivalent to a two-day suspension. In pay periods ending July 7, 2002, and July 21, 2002, your salary will be reduced by $62.60 per pay period from its current level of $625.92 per pay period to $563.32 per pay period. The reasons for this decision are set forth below.

You are currently assigned to the bridge operator "swing position" within District 61. This position requires you to function as a relief bridge operator during scheduled absences and to be on call to cover unscheduled absences within this District. It additionally requires that you perform routine ground and maintenance work as needed when you are not assigned to operate a bridge.

On April 15, 2002, your work hours were 7:30 a.m. until 3:30 p.m. At approximately 9:00 a.m., that day, Mr. Milton Endres, Hwy Foreman 2, telephoned you at the Bayou Sorrel Bridge and instructed you to report to the Indian Village Bridge to replace the burned out navigational lights and to pick up trash and spray herbicide, where needed, on the grounds. At approximately 11:15 a.m., Mr. Endres arrived at the Indian Village Bridge. You had replaced the navigational lights, picked up the trash, and had begun to spray herbicide. Mr. Endres reiterated his instructions and explained to you exactly where the herbicide needed spraying. Rather than promptly and cooperatively comply with Mr. Endres' instructions, you first complained to him about the amount of work required of you and complained that it was too hot to perform this type of work.

AN EQUAL OPPORTUNITY EMPLOYER
A DRUG FREE WORKPLACE

Mr. Endres left to run errands and returned at approximately 11:30 a.m. Shortly after arriving, you complained that you should be paid more than you were getting because you held the swing position. Mr. Endres explained to you that you were getting paid to do this type of work and that you could resign from your employment if you did not want to do the work required for your position. You did not respond, but instead placed the herbicide sprayer on the ground and began walking towards your vehicle. Mr. Endres asked you again if you wanted to resign. You responded by saying (substantively) that you wanted to file a complaint. Mr. Endres then gave you the name and telephone number of his direct supervisor, Mr. Rodney Jones, Engineering Technician 5. You then left the Indian Village Bridge at approximately 12:00 p.m. You did so without authorization of Mr. Endres and without his knowledge of where you were going. Additionally, you had not completed spraying herbicide on the southwest and northeast corner of the bridge as directed by Mr. Endres.

At approximately 1:30 p.m., Mr. Endres arrived at the Bayou Sorrel Bridge and saw you leaving from the bridge. After questioning the bridge operator on duty, Mr. Endres found out that you had only gone back to the Bayou Sorrel Bridge to pick up some personal belongings that you had brought that morning when you reported to work. You left the Bayou Sorrel Bridge without the authorization of Mr. Endres and were, therefore, placed on leave without pay for two hours.

Failure to promptly and cooperatively perform your assigned duties; leaving your duty station without authorization, and taking leave without authorization, violates Secretary's Policy and Procedure Memorandum (PPM) No. 29, Employee Conduct, and will not be tolerated. A copy of PPM No. 29 is appended hereto as Exhibit "A."

You have the right to appeal this action to the State Civil Service Commission. The time limits and procedures for appealing are contained in Chapter 13 of the Civil Service Rules. A copy of the Civil Service Rules can be found in the District 61 Personnel Office located at 8100 Airline Highway, Baton Rouge, Louisiana, or the DOTD Headquarters Personnel Section at 1201 Capitol Access Road, Baton Rouge, Louisiana.

Sincerely,

ROY SCHMIDT, P.E.
DISTRICT ENGINEER ADMINISTRATOR

BY:

TERRI ROBISON, P.E.
DISTRICT MAINTENANCE ENGINEER

TR/wlj
Attachment

pc: Mr. Roy Schmidt
Ms. Vickie Suplee
Ms. Deidre Adams
Mr. Rodney Jones
Mr. Milton Endres
Personnel




**STATE OF LOUISIANA**
**DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT**

P.O. Box 831
Baton Rouge, Louisiana 70821-0831
(225) 231-4102, Fax (225) 231-4108

M. J. "MIKE" FOSTER, JR.
GOVERNOR

KAM MOVASSAGHI, PH.D
SECRETARY

June 28, 2002

**HAND DELIVERED**

<u>**CORRECTED COPY**</u>

Mr. Rene LeMaire
39125 Hwy. 75
Plaquemine, Louisiana 70764

Dear Mr. LeMaire:

You have been employed by the Department of Transportation and Development since March 19, 2001, and currently serve with permanent status as a Bridge Operator 2. In accordance with Civil Service Rule 12.8 and Secretary's Policy and Procedure Memorandum No. 26, this is to provide you with advance notice that you are being suspended without pay for two (2) working days effective Friday, July 12, 2002, and Monday, July 22, 2002. The reasons for this decision are set forth below.

You are currently assigned to the bridge operator "swing position" within District 61. This position requires you to function as a relief bridge operator during scheduled absences and to be on call to cover unscheduled absences within this District. It additionally requires that you perform routine ground and maintenance work as needed when you are not assigned to operate a bridge.

On April 15, 2002, your work hours were 7:30 a.m. until 3:30 p.m. At approximately 9:00 a.m., that day, Mr. Milton Endres, Hwy Foreman 2, telephoned you at the Bayou Sorrel Bridge and instructed you to report to the Indian Village Bridge to replace the burned out navigational lights and to pick up trash and spray herbicide, where needed, on the grounds. At approximately 11:15 a.m., Mr. Endres arrived at the Indian Village Bridge. You had replaced the navigational lights, picked up the trash, and had begun to spray herbicide. Mr. Endres reiterated his instructions and explained to you exactly where the herbicide needed spraying. Rather than promptly and cooperatively comply with Mr. Endres' instructions, you first complained to him about the amount of work required of you and complained that it was too hot to perform this type of work.

Mr. Endres left to run errands and returned at approximately 11:30 a.m. Shortly after arriving, you complained that you should be paid more than you were getting because you held the swing position. Mr. Endres explained to you that you were getting paid to do this type of work and that you could resign from your employment if you did not want to do the work required for your position. You did not respond, but instead placed the herbicide sprayer on the ground and began walking towards your vehicle. Mr. Endres asked you again if you wanted to resign. You responded by saying (substantively) that you wanted to file a complaint. Mr. Endres then gave you the name and telephone number of his direct supervisor, Mr. Rodney Jones, Engineering Technician 5. You then left the Indian Village Bridge at approximately 12:00 p.m. You did so without authorization of Mr. Endres and without his knowledge of where you were going. Additionally, you had not completed spraying herbicide on the southwest and northeast corner of the bridge as directed by Mr. Endres.

AN EQUAL OPPORTUNITY EMPLOYER
A DRUG FREE WORKPLACE

Mr. Rene LeMaire
June 28, 2002
Page 2 of 2

At approximately 1:30 p.m., Mr. Endres arrived at the Bayou Sorrel Bridge and saw you leaving from the bridge. After questioning the bridge operator on duty, Mr. Endres found out that you had only gone back to the Bayou Sorrel Bridge to pick up some personal belongings that you had brought that morning when you reported to work. You left the Bayou Sorrel Bridge without the authorization of Mr. Endres and were, therefore, placed on leave without pay for two hours.

Failure to promptly and cooperatively perform your assigned duties; leaving your duty station without authorization, and taking leave without authorization, violates Secretary's Policy and Procedure Memorandum (PPM) No. 29, Employee Conduct, and will not be tolerated. A copy of PPM No. 29 is appended hereto as Exhibit "A."

You have the right to appeal this action to the State Civil Service Commission. The time limits and procedures for appealing are contained in Chapter 13 of the Civil Service Rules. A copy of the Civil Service Rules can be found in the District 61 Personnel Office located at 8100 Airline Highway, Baton Rouge, Louisiana, or the DOTD Headquarters Personnel Section at 1201 Capitol Access Road, Baton Rouge, Louisiana.

Sincerely,

ROY SCHMIDT, P.E.
DISTRICT ENGINEER ADMINISTRATOR

BY:

TERRI ROBISON, P.E.
DISTRICT MAINTENANCE ENGINEER

TR/wlj
Attachment

pc: Mr. Roy Schmidt
Ms. Vickie Suplee
Ms. Deidre Adams
Mr. Rodney Jones
Mr. Milton Endres
Personnel

Hand Delivered to: _____ Date: 7-2-02

Witness: _____ Date: 2-2-02

Witness: _____ Date: 7-2 02

# EXHIBIT SIX




**STATE OF LOUISIANA
DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT**

P.O. Box 831
Baton Rouge, Louisiana 70821-0831
(225) 231-4102, Fax (225) 231-4108

M. J. "MIKE" FOSTER, JR.
GOVERNOR

KAM MOVASSAGHI, PH.D
SECRETARY

August 5, 2002

Mr. Rene LeMaire
39125 Hwy. 75
Plaquemine, La. 70764

Dear Mr. LeMaire:

This is to advise you that effective Tuesday, August 6, 2002, you are being placed on suspension pending investigation pursuant to Civil Service Rule 12.10. This investigation concerns allegations of employee conduct.

This is a suspension with pay and will not last more than 30 days. It is not a disciplinary action.

You will be notified when you are to return to duty. Until such time you are not to come onto any DOTD premises including District 61 Headquarters, any of the Bridge Tender Houses, or any other DOTD locations. You may not contact individuals while on duty at any of the Bridge Tender Houses. You may not conduct DOTD business without first getting permission from me. You may contact me if you have any questions regarding this matter.

Very truly yours,

ROY M. SCHMIDT, P.E.
DISTRICT ENGINEER ADMINISTRATOR

BY: *Terri R Hammack*

TERRI R. HAMMACK, P.E.
DISTRICT MAINTENANCE ENGINEER

TRH/wlj

pc: Mr. Roy M. Schmidt
Ms. Dee Everett
Ms. Vickie Suplee
Mr. Rodney Jones
Mr. Milton Endres
Personnel

Hand Delivered: _____ Date: 8-6-02

Witness: _____ Date: 8-6-02

Witness: _____ Date: 8/6/02

AN EQUAL OPPORTUNITY EMPLOYER
A DRUG FREE WORKPLACE



**STATE OF LOUISIANA**
**DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT**

P.O. Box 831
Baton Rouge, Louisiana 70821-0831
(225) 231-4102, Fax (225) 231-4108

M. J. "MIKE" FOSTER, JR.
GOVERNOR

KAM MOVASSAGHI, PH.D
SECRETARY

August 6, 2002

**HAND DELIVERED**

**PRE-TERMINATION**

Mr. Rene LeMaire
39125 Hwy. 75
Plaquemine, Louisiana 70764

Dear Mr. LeMaire:

You have been employed by the Department of Transportation and Development since March 19, 2001, and currently serve with permanent status as a Bridge Operator 2. In accordance with Civil Service Rule 12.7 and Secretary's Policy and Procedure Memorandum No. 26, this is to advise you that you are being recommended for termination from employment with this Department. The reasons for this recommendation are set forth below.

You were scheduled to work from 6:00 am. until 2:00 p.m., Friday, July 19, 2002, at the Bayou Pigeon Bridge. Mr. Milton Endres, Highway Foreman 2, came to the Bridge House, that day, to deliver a lawn mower tire tube. He arrived at approximately 9:05 a.m., and found that all the blinds were lowered and closed and the door was locked. After knocking several times without getting an answer, he used his key to enter the building and found you laying on the floor asleep. You continued sleeping while Mr. Endres attempted to reach Mr. Rodney Jones, Engineering Technician 5, by telephone to report the incident. Mr. Jones was unavailable, therefore, Mr. Endres woke you from your sleep. You offered no explanation for having been asleep while on duty.

Later that day, and during the course of the next few days, you spoke openly to your co-workers about being caught sleeping. Specifically, you told Ms. Amy Henson, Bridge Operator 2, Ms. Louanna LeBlanc, Bridge Operator 2, Mr. Terry Davis, Bridge Operator 2, and Mr. Huey Gros, Bridge Operator 2, that you were once again in trouble because Mr. Endres caught you sleeping on the job.

You were scheduled to work on the Bayou Pigeon Bridge from 6:00 a.m. until 2:00 p.m. on Thursday, July 25, 2002. At approximately 6:35 a.m., that day, Ms. Ronda Boudreaux, Bridge Operator 2, passed the Bayou Pigeon Bridge on her way to Baton Rouge and noticed that it was unattended. The bridge in unmanned and closed for marine traffic from 10:00 p.m. through 6:00 a.m. each day. Ms. Boudreaux, knowing that the bridge should be in operation at this time, stopped at the Bridge Tenders' House and paged Mr. Endres to advise him that you were not at work as scheduled. She additionally telephoned Ms. Louanna LeBlanc and asked her to report for duty. Ms. Boudreaux stayed until Ms. LeBlanc arrived at approximately 6:45 a.m. You finally reported for duty at 10:00 a.m. When questioned by Ms. LeBlanc about where you had been, you responded, "at home asleep in my bed."

Ms. LeBlanc contacted Mr. Endres to let him know that you had arrived at work. Since Ms. LeBlanc was already working the bridge, she remained on duty as the bridge operator for the remainder of your shift. Therefore, at approximately 11:40 a.m., that day, Mr. Endres telephoned the Bayou Pigeon Bridge and instructed you to cut the grass. After hanging up the telephone, you told Ms. LeBlanc that it was almost 12:00 p.m. and that you were not going to cut the grass. You then took the bridge house portable telephone and walked outside where you remained on the telephone until 1:30 p.m. You left work at 2:00 p.m., without having cut the grass as instructed.

Sleeping on the job; reporting for work late without securing leave in advance or notifying anyone in a position of authority that you were otherwise unable to report for duty; and refusing to perform your assigned duties violates Secretary's Policy and Procedure Memorandum (PPM) No. 29, Employee Conduct. A copy of PPM 29 is appended hereto as Exhibit "A."

Being alert and awake while on duty and timely reporting for your assigned shift are critical functions of the position you hold. As bridge operator, you are responsible for opening and closing the moveable bridge for safe passage of marine and vehicular traffic. Sleeping while on duty and leaving the bridge unattended, not only causes inconvenience and delay to marine traffic, but poses a significant hazard for those vessels who depend on the bridge being operational during designated times. Such disregard for your duties, responsibilities, and the safety of others cannot be tolerated.

In further support of this recommendation, I have taken into consideration that by letter dated June 28, 2002, you received a two-day suspension for failure to promptly and cooperatively perform your assigned duties, leaving your duty station without authorization, and taking leave without authorization. A copy is appended hereto as Exhibit "B."

You have the right to respond to this proposed action. In this regard, a meeting has been scheduled for Tuesday, August 13, 2002, at 8:00 a.m., in my office located at District 61 Headquarters, Baton Rouge, Louisiana. You may, at this time, present reasons why this action should not be taken or why a lesser penalty should be imposed. Be assured, your response will be thoughtfully considered before taking action on this recommendation.

Sincerely,

ROY SCHMIDT, P.E.
DISTRICT ENGINEER ADMINISTRATOR

BY: _____

TERRI R. HAMMACK, P.E.
DISTRICT MAINTENANCE ENGINEER

TRH/wlj
Attachments

pc: Mr. Roy Schmidt
    Ms. Vickie Suplee
    Ms. Deidre Adams
    Mr. Rodney Jones
    Mr. Milton Endres
    Personnel

Hand Delivered to: _____  Date: _6-7-02_

Witness: _____  Date: _8/6/02_

Witness: _____  Date: _8-6-02_





**STATE OF LOUISIANA**
**DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT**

P.O. Box 831
Baton Rouge, Louisiana 70821-0831
(225) 231-4102, Fax (225) 231-4108

M. J. "MIKE" FOSTER, JR.
GOVERNOR

KAM MOVASSAGHI, PH.D
SECRETARY

August 15, 2002

<u>**CERTIFIED MAIL NO. 7000 1670 0012 5264 6533**</u>
<u>**RETURN RECEIPT REQUESTED**</u>

<u>**TERMINATION NOTICE**</u>

Mr. Rene LeMaire
2403 St. Simon
Donaldsonville, Louisiana 70346-4037

Dear Mr. LeMaire:

You have been employed by the Department of Transportation and Development since March 19, 2001, and currently serve with permanent status as a Bridge Operator 2. In accordance with Civil Service Rule 12.8 and Secretary's Policy and Procedure Memorandum No. 26, this is to advise you that you will be terminated from your employment with the Department effective Monday, August 26, 2002. The reasons for this termination are set forth below.

You were scheduled to work from 6:00 am. until 2:00 p.m., Friday, July 19, 2002, at the Bayou Pigeon Bridge. Mr. Milton Endres, Highway Foreman 2, came to the Bridge House, that day, to deliver a lawn mower tire tube. He arrived at approximately 9:05 a.m., and found that all the blinds were lowered and closed and the door was locked. After knocking several times without getting an answer, he used his key to enter the building and found you laying on the floor asleep.

You continued sleeping while Mr. Endres attempted to reach Mr. Rodney Jones, Engineering Technician 5, by telephone to report the incident. Mr. Jones was unavailable, therefore, Mr. Endres woke you from your sleep. You offered no explanation for having been asleep while on duty.

Later that day, and during the course of the next few days, you spoke openly to your co-workers about being caught sleeping. Specifically, you told Ms. Amy Henson, Bridge Operator 2, Ms. Louanna LeBlanc, Bridge Operator 2, Mr. Terry Davis, Bridge Operator 2, and Mr. Huey Gros, Bridge Operator 2, (substantively) that you were once again in trouble because Mr. Endres caught you sleeping on the job.

You were scheduled to work at the Bayou Pigeon Bridge from 6:00 a.m. until 2:00 p.m. on Thursday, July 25, 2002. At approximately 6:35 a.m., that day, Ms. Ronda Boudreaux, Bridge Operator 2, passed the Bayou Pigeon Bridge on her way to Baton Rouge and noticed that it was unattended. The bridge in unmanned and closed for marine traffic from 10:00 p.m. through 6:00 a.m. each day. Ms. Boudreaux, knowing that the bridge should be in operation at this time, stopped at the Bridge Tenders' House and paged Mr. Endres to advise him that you were not at work as scheduled. She additionally telephoned Ms. Louanna LeBlanc and asked her to report for duty. Ms. Boudreaux stayed until Ms. LeBlanc arrived at approximately 6:45 a.m. You finally reported for duty at 10:00 a.m. When questioned by Ms. LeBlanc about where you had been, you responded, (substantively) "at home asleep in my bed."

Ms. LeBlanc contacted Mr. Endres to let him know that you had arrived at work. Since Ms. LeBlanc was already working the bridge, she remained on duty as the bridge operator for the remainder of your shift. Therefore, at approximately 11:40 a.m., that day, Mr. Endres telephoned the Bayou Pigeon Bridge and instructed you to cut the grass. After hanging up the telephone, you told Ms. LeBlanc that it was almost 12:00 p.m. and that you were not going to cut the grass. You then took the bridge house portable telephone and walked outside where you remained on the telephone until 1:30 p.m. You left work at 2:00 p.m., without having cut the grass as instructed.

Sleeping on the job; reporting for work late without securing leave in advance; and refusing to perform your assigned duties violate Secretary's Policy and Procedure Memorandum (PPM) No. 29, Employee Conduct. A copy of PPM 29 is appended hereto as Exhibit "A." Further, being alert and awake while on duty and timely reporting for your assigned shift are critical functions of the position you hold. As bridge operator, you are responsible for opening and closing the moveable bridge for safe passage of marine and vehicular traffic. Sleeping while on duty and leaving the bridge unattended, not only causes inconvenience and delay to marine traffic, but poses a significant hazard for those vessels who depend on the bridge being operational during designated times. Such disregard for your duties, responsibilities, and the safety of others cannot be tolerated.

In further support of this action, I have taken into consideration that you received a two-day disciplinary suspension for failing to promptly and cooperatively perform your assigned duties, leaving your duty station without authorization, and taking leave without authorization. A copy of the disciplinary letter, dated June 28, 2002, is appended hereto as Exhibit "B."

A pre-deprivation hearing was scheduled for Tuesday, August 13, 2002, at 8:00 a.m., to provide you with an opportunity to respond to the charges contained in my Pre-Deprivation Notice dated August 6, 2002. Present were your attorney, Mr. Joe Stevenson, Ms. Victoria Suplee, Attorney, Ms. Dee Everett, Human Resources Manager, and myself. Mr. Stevenson submitted, on your behalf, an affidavit executed by you in response to my Pre-Deprivation Notice. After careful consideration of your response, I have elected to proceed with your termination.

You have the right to appeal to the Civil Service Commission. The time limits and procedure for appealing are contained in Chapter 13 of the Civil Service Rules. A copy of the Civil Service Rules can be found in the District 61 Personnel Office, 8100 Airline Highway, Baton Rouge, Louisiana, or DOTD Headquarters Personnel Office located at 1201 Capitol Access Road, Baton Rouge, Louisiana.

Sincerely,

ROY SCHMIDT, P.E.
DISTRICT ENGINEER ADMINISTRATOR

BY:

TERRI R. HAMMACK, P.E.
DISTRICT MAINTENANCE ENGINEER

TRH/wlj
Attachments

pc: Mr. Roy Schmidt
    Ms. Vickie Suplee
    Ms. Dee Everett
    Mr. Rodney Jones
    Mr. Milton Endres
    Attorney Joe F. Stevenson
    Personnel

# EXHIBIT SEVEN

## LOUISIANA DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT

### SECRETARY'S POLICY AND PROCEDURE MEMORANDUM (PPM) NO. 13

SUBJECT: Sexual Harassment Policy

EFFECTIVE DATE: February 3, 1993

INSTRUCTIONS: This memorandum supersedes all previous memoranda and manuals.

The Louisiana Department of Transportation and Development's (DOTD) policy is that all members have a right to work in an environment free of discrimination, which includes freedom from sexual harassment. The DOTD strongly disapproves of sexual harassment of its members and applicants in any form. This policy also states members at all levels of the DOTD must avoid offensive or inappropriate sexual and/or sexually harassing behavior at work. The DOTD will not tolerate sexual harassment by its managers, supervisors, and administrators; member's coworkers; or nonmembers, whose conduct makes the DOTD liable and responsible for corrective action. Each manager and supervisor will be held responsible for ensuring that his/her workplace is free of sexual harassment.

Specifically, the DOTD prohibits the following: unwelcome sexual favors; requests for sexual favors, whether accompanied by promises or threats concerning the employment relationship; verbal or physical conduct of a sexual nature made to any member which may threaten or insinuate, either explicitly or implicitly, that a member's submission to or rejection of sexual advances will in any way influence any personnel decision regarding that person's employment, evaluation, wages, advancement, assigned duties, shifts, or any other condition of employment or career development; verbal or physical conduct that has the purpose or effect of interfering with the member's ability to do his/her job; verbal or physical conduct that has the purpose or effect of creating an intimidating, hostile, or offensive working environment.

Any member or supervisor found by the Department to have sexually harassed another member or applicant will receive the appropriate disciplinary action, ranging from a written warning up to and including termination.

Other sexually harassing conduct in the workplace, whether physical or verbal, committed by supervisory or nonsupervisory personnel is also prohibited. This behavior includes, but is not limited to the following: comments about an individual's body; sexually degrading words to describe an individual; sexual propositions; making suggestive or insulting noises; touching, pinching, or brushing the body; assault; and sexually suggestive objects, books, magazines, photographs, cartoons, or pictures.

SECRETARY'S POLICY AND PROCEDURE MEMORANDUM (PPM) NO. 13
SUBJECT:  Sexual Harassment Policy
Page 2

The stereotypical case of a male supervisor/female member is only one example of sexual harassment.  Such discrimination may involve other fact patterns, e.g., the victim or the harasser may be of either sex; the harasser does not have to be the victim's supervisor; the harasser may be an agent of the Department, a supervisor from another department, coworker, or, occasionally, a nonmember; the victim and the harasser may be of the same sex; the victim does not have to be the person to whom the sexual advances are directed; the victim may be a coworker who is affected by the conduct toward another, since the sexual harassment of the employee may create an intimidating and hostile work environment for others.

Any member who has complaints of discrimination by anyone at work, including any supervisor, coworker, or visitors, is urged to report this conduct directly to his/her supervisors.  If the complaint involves the member's supervisor or someone in the direct line of supervision, or if the member for any reason is uncomfortable in dealing with his/her immediate supervisor, the member may go to another supervisor or contact the following:

COMPLIANCE PROGRAMS SECTION
DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT
POST OFFICE BOX 94245
BATON ROUGE, LOUISIANA  70804-9245
TELEPHONE:  (504) 379-1382 OR LINC 425-1382

The DOTD will investigate all complaints as expeditiously and professionally as possible.  Where investigations confirm the allegations, appropriate corrective action will be taken.

There will be no retaliation against a member for reporting sexual harassment or assisting the DOTD in the investigation of a complaint.  However, if after investigating any complaint of harassment or unlawful discrimination, the DOTD learns that the complaint is not bona fide or that the member has provided false information regarding the complaint, disciplinary action may be taken against the member who provided the false information.

I trust that each member will continue to act in a responsible and professional manner to establish a pleasant working environment free of discrimination.

JUDE W. P. PATIN
Secretary

TOTAL P.02

LOUISIANA DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT

SECRETARY'S POLICY AND PROCEDURE MEMORANDUM (PPM) NO. 13

SUBJECT:    Workplace Harassment Policy

EFFECTIVE DATE:  February 3, 1993

INSTRUCTIONS:  This memorandum supersedes all previous memoranda and manuals.

## 1. Purpose

The purpose of this policy is to guide the Department of Transportation and Development and its employees in providing a work environment that is free from harassment of any employee by another employee, supervisor, contractor or customer.

Harassment negatively affects morale, motivation and job performance. It results in increased absenteeism, turnover, inefficiency and loss of productivity. It is inappropriate, offensive and illegal, and will not be tolerated.

## 2. Prohibited Conduct

This policy prohibits conduct that has the purpose or effect of unreasonably interfering with an individual's work performance or creating an offensive or hostile work environment and forbids harassment of any kind on the basis of race, sex, religion, color, national origin, age or disability.

Examples of conditions or behavior that, when unwelcome or repeated, may be harassment are: (1) sexual flirtations, advances, or propositions; (2) physical contact or touching such as patting, pinching, brushing against another's body, and impeding or blocking movement; (3) verbal comments or statements regarding an individual's race, sex, color, national origin, religion, age or disability such as derogatory comments or slurs, jokes, or graphic or degrading comments; (4) visual displays such as posters, cartoons, displays of suggestive, derogatory or degrading objects, pictures or drawings in the workplace.

## 3. Sexual Harassment

Sexual harassment is a form of sex discrimination and is an "unlawful employment practice" under Title VII of the 1964 Civil Rights Act. It is illegal when it is part of a manager's or supervisor's decision to hire or fire someone; when it is used to make other employment decisions like pay, promotion or job assignment; when it interferes with the employee's work performance; or when it creates an intimidating, hostile or offensive work environment.

SECRETARY'S POLICY AND PROCEDURE MEMORANDUM (PPM) NO. 13
SUBJECT: Workplace Harassment Policy
Page 2

Sexual harassment is defined as deliberate or repeated behavior of a sexual nature which is unwelcome. In addition to the behaviors described in Section 2, this policy prohibits any demand or subtle pressure for sexual favors accompanied by promises or threats relating to an individual's employment status.

4. Responsibilities

Every DOTD employee is expected to refrain from behaviors or activities in the workplace that may be considered harassment. Employees who experience harassment are encouraged to politely but firmly confront the harasser and ask the person to stop.

Additionally, supervisors and managers are responsible for ensuring that harassment does not occur in their work areas. Supervisors and managers must treat any observed or reported incident of harassment as a potentially serious breach of policy as well as a potential violation of the law and promptly report such incidents to the Headquarters Human Resources Section.

Individuals who feel they have been subjected to harassment must immediately report such treatment to a supervisor, manager, appointing authority or to the Human Resources Section (HQ Building, Room 300-W; telephone 225-379-1239 or -1259.)

5. Complaint Process

Complaints may be submitted verbally as described in the above paragraph or in writing, using the attached form. Complaints of harassment will be dealt with promptly. Investigations will be conducted in a thorough and impartial manner. The often confidential nature of such cases is recognized and will be respected to the extent permitted by law during investigation and corrective efforts.

When an investigation confirms that an individual has violated this policy, remedial action, including disciplinary action up to and including termination will be taken.

Employees retain the right to file a complaint of discrimination with the Equal Employment Opportunity Commission, the Louisiana Civil Service Commission or pursue any other legal remedy. This procedure does not extend any time limitations for filing with outside parties.

6. Retaliation

Retaliation of any kind directed against an individual because that person reported such harassment or participated in an investigation is absolutely prohibited.

SECRETARY'S POLICY AND PROCEDURE MEMORANDUM (PPM) NO. 13
SUBJECT:  Workplace Harassment Policy
Page 3

7. Secretary's Commitment

As DOTD Secretary, I am committed to preventing and eliminating all unlawful discriminatory conduct from our workplace.  I further expect all supervisors and managerial personnel to take a leadership role in providing all employees with a workplace free from any form of discrimination or harassment.

Kam K. Movassaghi, Ph.D., P.E.
Secretary

Attachment
*Harassment Report

SECRETARY'S POLICY AND PROCEDURE MEMORANDUM (PPM) NO. 13
SUBJECT: Workplace Harassment Policy
Page 4

## HARASSMENT REPORT

Name of Employee Making the Allegation: _____

District/Section: _____ Gang: _____ Work Location: _____

Telephone: _____

Name of Immediate Supervisor: _____

Name of Person(s) Against Whom the Allegation is being made:
_____

Give a clear and concise statement of the facts constituting each alleged charge and the dates,
times and places when such act(s) allegedly occurred: (Use extra paper, if
necessary)_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Name(s) of Witness(es):_____

_____

_____          _____

(Signature of Person Filing Report)          (Date Report Filed)